Case number 22-2057 William Ashford v. University of Michigan et al. Argument is not to exceed 15 minutes per side. Mr. Schwartz, you may proceed for the appellant. Thank you. Good morning, Your Honors. If I may reserve four minutes for rebuttal. Fine. Your Honor, the underlying dispute here involves the propriety of a two-week suspension that was given to Plaintiff Appellee William Ashford. The University of Michigan Dearborn Police Department has several standards of conduct that it relies upon to promote the efficient public safety services that it's responsible for. Some of these are fairly self-evident. You know, don't use information you gain by virtue of being a police officer for something other than an official purpose. Don't make public statements that are going to be reasonably interpreted as having, you know, a negative effect on the department and comply with officers from orders from your superior officers. The rules here are intended to ensure that UM-Dearborn Police is able to focus on serving the community and protecting the integrity of its investigations. Here, Ashford became aware of an investigation into a UM-Dearborn police professor. He had some experience with sex crimes at a prior job and decided to interject himself into this investigation. One of it includes kind of reaching out to the Wayne County prosecutor. When Ashford didn't believe his internal gripes were being addressed, he took them to the media, sharing non-public information about an ongoing active investigation violating several work rules. Describing the information that he had and he shared, he testified on page 82 and 83 of his deposition that it was information that he was, quote, privileged to it as a police officer. There's no evidence that this is just information that anyone from the public would have just stumbled upon. Among the articles, the details in the article that made their way into the article that he shared included the name of the professor who was accused of a crime that had not been charged and this was information that could have compromised the fairness of the adjudication process for the defendant. The university investigated. Ashford violated another work rule. He refused to tell his superior who divulged other information, non-public information. So after the investigation was complete, it was just a two, a 10-day, two-week suspension. That's the whole case. There was a bunch of... The suspension without pay, is that correct? It was a suspension without pay. So this isn't this, you know, this case isn't about whether the investigation, you know, anything about, you know, whether the investigation was correct or what happened to the professor. This is just about William Ashford. And the appeal is pretty focused because it's just focused on the immunity issues since this is from a denial of summary judgment. The first issue with sovereign immunity, I think it's clear and I don't think there's any dispute that the bar on monetary damages here exists. But he also sought injunctive relief. He wanted to be protected in the future. Correct, Your Honor. I was going to get that. They tried to rely on the Ex parte Young exception. The Ex parte Young provides a limited exception to claims against the university officials in their official capacity. And the key is it only permits prospective injunctive relief. I believe there are a couple of critical principles that the district court missed. First, and this is, I'm going to read from the TM versus DeWine case, which we cite is, you know, determining whether relief is retroactive or prospective requires, quote, a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective retroactive relief for past unlawful conduct will not do. Why isn't Morgan? Why doesn't Morgan? Sure. So for one, Your Honor, I believe Morgan, I believe that any conversation about retroactivity in there was dicta because I think in that case it ultimately found that the Ex parte exception didn't apply. But it specifically addressed the issue, didn't it say, let me, um, that the district court was in error to hold that it lacked subject matter jurisdiction on the grounds that the plaintiff had not pleaded facts establishing a form of requested relief that is available under Ex parte Young. I mean, they're very clear that you may, um, you may get prospective relief in the very sort of circumstance that Mr. Ashford was requesting it, right? Yeah, I agree that the language in Morgan, um, isn't great for me, but I don't believe it's binding on this court because I don't think it was essential to the ruling that was before the court. And there's also a prior decision in the S and M Brands case, which talks about, um, you know, and this is a quote, quote, the case law from both the Supreme court and our court does not bar only retroactive monetary relief, but also, but rather all retroactive relief. So what you have here, you have something that happened in the past and plaintiffs are trying to undo it. Logically speaking for a prospective purpose, aren't they? Because this is, this is an organized, um, entity. They have rules about, um, punishment and rules about punishment that can escalate based on what wrong you have already committed that remains in your record. Isn't that correct? So that's, that's what they're trying to allege. I believe in response to summary judgment and on Unlike some other cases where there is a plausible allegation, either in the complaint or evidence at summary judgment of a potential future constitutional violation. I don't think you have that here. Um, there was an attempt to amend, which is referred to in both of our briefs. And the motion of amendments is not an issue that's before here, but that undercuts any, any argument that, that there is a threat of an ongoing future constitutional violation there. Um, you know, that, you know, while, so here, while he's speculating that this discipline could theoretically be used against him, I think that motion to amend, um, confirms that that speculation is unfounded. And I don't think you could rely on speculation to overcome it. If there is record information of policies in this record, it doesn't matter, does it? That that is not that there was not a later amendment to the complaint. If in fact you can build on existing punishment to enforce additional punishment, right? What I was, what I was, um, getting at with the amendment is the amendment cited some additional punishment he had, and there was an attempt to add a claim there. But if you look at that additional punishment, which is on page ID 2316 to 2317, um, and 20 and 3318 of the, um, lower court record, that, that discipline doesn't even mention anything related to the suspension that is the basis for this case. There's no admissible evidence in the record that it's even permissible to use this, you know, um, discipline from several years ago that could even be used on an ongoing basis now. It's all just speculation that it could be. Um, Mr. Ashford is, you know, is a member of a, you know, in a collective bargaining agreement, and there was no plausible allegation either in the complaint or facts that were provided in summary judgment that, yes, it's true, this could actually be used, um, um, as part of it. There were some, I cannot give you the site in the record, but I understood that there were some threats made to him based on escalating punishment by either, is it Gorski, do I have the name correct, or Evans, the two individuals involved in this? I think it was Gorski. All that was before the complaint was filed. There's no evidence of any ongoing, um, or no allegation or evidence. There does not have to be evidence that it is going to happen to it. There has to be evidence that because of that information in his employee file, he can be further punished, because that's what expungement in Morgan and the other cases are about, because the goal is to enjoin future acts of discrimination, retaliation, and intimidation, and he clearly pleads that, right? But I don't think there is evidence that it could be used against him. I believe it's speculation that it could be used against him, and I think that, you know, that the second discipline he received is evidence of it. Discipline often references, oh, by the way, you also have this other stuff happened in the past. That's not what you have here. It's completely independent discipline. It doesn't reference what happened in the past. Are you making a representation that the University of Michigan will not ever in the future utilize the fact of this, uh, suspension that happened? So, your honor, I believe, which I don't believe the collective bargaining agreement is in the record here, um, just based on, on the way this came up and what, but I believe the university of, I believe that the applicable collective bargaining agreement prevents the university from using discipline that is more than two years old. That's my understanding of the collective bargaining agreement. So you are making such a representation that on behalf of the university that his suspension that happened. Yes. I'd not be used. Correct. And will not be used. Yes. My, my, that's my understanding of the policy. Um, if I may turn briefly to, um, the qualified immunity with the few minutes I have, have left. Um, I just want to kind of focus on, you know, one of the things that plaintiff has to establish that it's the, um, his constitutional right has to be clearly established in this context. And it's the district court said that you did not argue that below whether the right was clearly established. Is that correct? I know that the district court said that. I believe we did. We argued in our motion for summary judgment that what plaintiff did here is just plead a general. I have a first amendment, right? And we said, they haven't alleged that first amendment right out of in their response brief, they go and elaborate on that. And I'll reply brief. Then we kind of focus on, we expand and we respond to what they were there. We reply to what their response argument is and say, wait a minute, that's not clearly established in the present context. Because if you're focusing on the context of a police department, this court has, you know, this court has provided deference to police departments and law enforcement agencies. I mean, that's in the Gillis case, where the court has said, we have long recognized the importance of deference to law enforcement officials when speech threatens to undermine the functions of organizations charged with maintaining public safety. So if plaintiff starts with the broad, I just have a broad first amendment, right? And you can't violate it. That's never been enough to avoid qualified immunity. You have to be a little bit more specific. First time it gets a little bit more specific is in response to our motion for summary judgment. And then we reply to it. So I, I know, understand the court, district court had found that, but I disagree that there was any form of waiver because I believe we made it out. Okay. On the other section of qualified immunity, the district judge held that there were factual questions. Why does that not deprive us of jurisdiction? Sure. I don't believe there was a factual, the identified facts that he said doesn't prove that either one of them were in knowledge or had, or had knowledge of a violation or actually involved. But one of them, I believe for Evans, it said he was kept in the loop. There's got to be more to a constitutional violation than just being kept in the loop. I don't believe what the court found there was factually enough to create or was enough to create a factual issue. And I see I'm got a couple of seconds left, but I'll save mine. Thank you. Good morning. May it please the court, Elizabeth Marzotto-Taylor on behalf of the plaintiff. We are asking you to affirm Judge Berg's opinion here. I think we're all aware that, you know, based on the summary judgment standard, the facts have to be viewed in the light most favorable to the plaintiff. So unfortunately, opposing counsel's recitation of the facts did not, you know, accept our version of the facts in the light most favorable to us. So I do just want to point that out, but I don't want to spend a lot of time rehashing the facts because they're set forth in our brief. I first want to talk about 11th Amendment immunity. I think, Judge Strange, you are correct that Morgan very sufficiently lays out what the legal standard here and is a correct recitation of the law. Whether that's dicta or not, I think that's kind of up for debate. Because in Morgan, the lower court's primary holding was that the claim failed on 11th Amendment immunity, and then the court said that holding was an error. So, but regardless, even if it is dicta, it is good law. It is a recitation of the law that should be adopted here for the reasons that you, you know, pointed out in your questions. We are not relying on our draft amended complaint as our basis for alleging a continuing violation or requesting prospective relief. Our operative complaint says enough. It can plausibly be interpreted as requesting that kind of prospective relief and alleging an ongoing harm. Officer Ashford has alleged that he has a marred record based on an unconstitutional disciplinary action that he received. For what it's worth, it's the first discipline in his lengthy career as a law enforcement officer. So how do you decide whether something is retrospective or prospective in terms of relief that you want here? So he has this disciplinary judgment by the University of Michigan, and he wants to have his record cleared, expunged, perhaps. What is that, retrospective or prospective? In Cummins, this court held that expunging an unconstitutional disciplinary record is nothing more than prospective relief. That was, that was the holding in Cummins, and that case involved a university student who was, he alleged, disciplined unconstitutionally. He requested that his record be expunged. The court said that that was nothing more than prospective relief. The law in the Sixth Circuit is clear on this. As if he's requesting damages. Damages. That's right. Would be. Right. Would be. That's correct. And also, Ex parte Young talks about, you know, one of the considerations that those in the straightforward inquiry is looking at whether the relief that's requested impacts the coffers of the state. Damages would impact, would, you know, impact, you know, money flowing out of the state. That's a characteristic of retroactive relief. That's not present here. So this whole analysis that your opponent was going through about whether under the collective bargaining agreement, this particular discipline could count for future wrongs that he might commit. That's irrelevant. That's not in the record. That's not in the record in this case. Bargaining agreement. It's not. You mean. That's right. There is absolutely. There has been zero testimony by any official of the university in this case saying that this is the first time I'm hearing of it today. That is not in the record before this court. I also want to say this. You were correct, Judge Schranch, that there is, you know, record evidence in this case. To the contrary, he was given a suspension on paper. That paper said that further violations will be subject to, and I quote, escalating discipline to include termination. So that is what the record in this case says. Not my, you know, opposing counsel's representations before this court. I agree with Judge Berg that below defendants did not make a legal argument that any aspect of this First Amendment retaliation claim was not clearly established at the time. I do want to tell you, because you can, whether they forfeited the argument or not, you can take it up as a technical matter. So I do want to tell you why it was clearly established. First of all, the first flaw that they say, they point out with the protected speech, was that he learned about the information he spoke of at work. That is not the law of the years, potentially decades, that unless the speech itself is what that person was hired to do, quoting from Garcetti, the speech is protected. So in this case, Judge Berg correctly held that there is no evidence that Elliot Ashford had any role with regard to speaking to the media. The courts have relied on that kind of evidence in other cases. He had absolutely no duties or associated with this investigation. Judge Berg was correct that the law is clearly established, that there was no way that a reasonable official could have believed that this was unprotected speech because he learned about the information he spoke of at work. They try to point to cases like Omokahinde and say that somehow this was what he was hired to do. First of all, there's no evidence of that. Second of all, the facts in Omokahinde are completely distinguishable from the facts here. There, the court actually found that that individual, that plaintiff, was actually hired to make the kinds of complaints and raise the kinds of concerns that she then relied on as her protected speech. But he, getting sort of to the heart of it, he learned about the facts of this university professor, Saltic, student. He learned about that because he was a police officer at the university. So why shouldn't we focus on that fact? He then discloses that to the press. Because there is law contrary to that. Specifically. Specifically. I want to quote you from Lane. The mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee rather than citizen speech. That comes from page 240 of the Lane v. Frank's opinion. That is directly on point here. That is simply not enough. There was a Sixth Circuit case, I believe it's Eckhardt, that also, you know, went into the same analysis and said that there is no way that this law wasn't clearly established at the time of the speech. In that case, I think the speech happened in, like, 2013 or something like that. Those cases preceded the date of this That's correct. That is right. So, you know, there's Certainly. So I'm going to cite to a Sixth Circuit case from 2015, Devlin v. Calm, 630 F Appendix 534 at 539. Quote, that the employee's speech interfered with workplace functioning before taking action. So here the university does not contest the fact that this is speech which talked about a matter of public concern. In fact, the courts have characterized the type of speech at issue here as the highest of all public concerns. Whether a government entity is acting in accordance with the law, whether they are violating the public trust. And because of that, it is clearly established that the defendants have to proffer evidence that this speech actually disrupted their functions. We have all of these stakeholders in the discipline and everyone up to the executive director of all security services testifying under oath that there was no evidence of any disruption to any function of that department, that there was no evidence that anything he said was intended to disrupt the function of any department. They're under oath on this. That is the record in this case showed that the university bungled the handling of this matter. And isn't that holding the university up to disrepute? No, your honor. There is case law saying that if the government makes this kind of error, the government should welcome this kind of criticism because that is what the First Amendment is designed to protect. The government does not have, you know, a controlling interest in never being called out for violating the public trust that exists nowhere in the law. We're hearing this on an interlocutory appeal of a denial of summary judge. The university moved for summary judgment, right? That's right. District court denies summary judgment. Normally, the denial of summary judgment is not immediately appealable, but because it's two immunity issues, we do get to hear this appeal. So what is your requested relief then from us? Is it that we affirm the district court and send the case back to the district court for trial? Is that it? That's right. I do think that, I mean, potentially the way that the defendants have framed their argument could create a jurisdictional problem for the appeal in sovereign immunity because they have absolutely refused to accept our version of the facts and view the facts in the light most favorable to us. If it is their position that you cannot decide the legal question of whether the right was clearly established unless you accept their version of the facts. Does that go to the qualified immunity or the sovereign immunity? Qualified immunity. Yeah. So, you know, potentially there's a jurisdictional problem, but I mean, realistically, the court could just excise those portions of the argument. There's the Delazio case that says the court can excise those portions of the argument, accept the facts in the light most favorable to plaintiff, and make the decision. So I just want to check my notes here and make sure I covered everything. Oh, I do want to talk about Gillis. The Gillis case did not overturn the law that I talked to you about earlier with regard to, you know, it was clearly established since mid-2008 that because of the type of speech that he engaged in, they had to actually come up with evidence of a disruption. Gillis doesn't disrupt that authority. It is actually in accord with that In the Gillis case, that involved a correctional officer who essentially threw a grenade into an internal investigation that the jail was doing into illegal contraband, you know, drugs and weapons getting into the prison. The court said his speech did not, the court actually distinguished his speech from cases like Solomon, where the speaker was talking about, you know, corruption and breach of the public trust. They said that wasn't the type of speech that was involved in Gillis. And because, you know, the officer in Gillis did things like, you know, tell his co-workers not to participate in the investigation. He gave them a script to read if they were asked questions. They said, yeah, okay, a threat could be enough in that situation, given the nature of the speech, the protected speech at issue and, you know, his actions. So in this case, our client's actions, entirely distinguishable from the actions in Gillis for the reasons that we set forth in our briefing, and also two different kinds of speech. It is clearly established law in the Sixth Circuit that based on the type of speech our client engaged in, undisputedly engaged in, they had to come up with actual proof of a disruption to the work environment. We have them under oath to the contrary. They have no evidence out of their mouths. So the rights here were clearly established. There is no sovereign immunity here for the relief that we have requested. And subject to questions, I think that's all I've got. Thank you. Thank you, Your Honor. I want to start with the kind of the actual disruption point from Gillis that Sister Counsel just mentioned. Gillis was pretty clear, and it says on page 687, like the majority of our sister circuits, we do not see the necessity for an employer to allow events to unfold to the extent of disruption of the office and the destruction of the working relationships as manifest before taking action. So what Gillis sets forth is you don't look at it three years later about what happened. You look at what was there at the time. But didn't your clients deny that there was a disruption? In retrospect, they did. When they're asked about it during their deposition, let's look back and see what happened. And I think they're focusing on what happened then. In retrospect, they could say, okay, it wasn't as bad as it could have been. But police can't... Wait. I'm sorry. Your argument is that they testified that there was not a disruption, but that was at the time of their deposition. So they now get to say there was a disruption? No. I'm confused. Whether there's an actual disruption is different. It's at the time is whether they reasonably believe there could be a disruption. So the university has these standards of conduct because in the heat of the moment, they can't go and conduct a deep inquiry and divert all these resources from their law enforcement investigations about whether... They didn't. They said they didn't. Your position is we cannot hold them to the testimony at their deposition. No. What my position is, I don't think you can look about it to the actual disruption idea in hindsight. You can't look back and say, in hindsight, was there an actual disruption? If you can't do that, then everybody gets to presume it's disruptible? No, I don't think it goes that far, Your Honor. Then how far does it go if I can't hold a deponent to his testimony? What I think it's here is they can't... In that moment, when you're disclosing the name of somebody who has not been charged, that's something that... And who has substantial rights himself, that's something that by itself is something that the university, when they're investigating, have to look at. Whether it caused a further disruption to morale, there's lots of different subcomponents of the rule that he was charged with violating. The university doesn't have to go back and prove each of those components. They could admit, yes, there was no massive disruption here. But one of the other critical parts is he also... There were three different main areas as part of the professional standards investigation. He also disobeyed a direct order from his superior to answer a question about who else divulged non-public information. So he refused to do that. So that's, I believe, an independent reason where you don't even have to look at the other aspects of it. And how did that disrupt the operation of the remainder of this entity? That doesn't have anything to do with his public speech. So that last part, refusing an offer, refusing a direct command from your officer to answer a question during a professional standards investigation, that's completely independent of the speech. It's not talking about what he shared with the media. That's talking about him providing information during the course of an internal investigation. And it's not even about him. It's about somebody else. So could he have received the same 10-day suspension just for refusing to say who else gave the info to the press? I believe he can. The suspension isn't parsed out saying there were three days here. There were three different reasons for it. And I believe each of them are independent and alternative. And it allows you to avoid the nuance about which aspect of it actually caused the termination. I want to go back to just briefly on the retroactive perspective. I think the S&M case was pretty clear. It's not just money. You don't look at whether it's just Yes, if it's money, that's barred by sovereign immunity. But when you look at it, if it's retroactive, period, full stop, that is also barred. If it's prospective, it could cost some money, ancillary. That might be fine. And that's allowed under certain circumstances. But under the standard sister counsel's advocating for, there is no end to it. It's a slippery slope that you can go back and rewrite history, go back and ask for a vacature of borders that have been in the past. And although the common sense notion of changing something that happened in the past is retroactive, we're not going to be following the plain dictionary definition of what retroactive means anymore. Thank you, Your Honor. Thank you both for your argument. And the case will be submitted.